No. 19-51083

# In the United States Court of Appeals for the Fifth Circuit

Rosa Estella Olvera Jimenez,

*Petitioner – Appellee,*

*v.*

Lorie Davis, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent – Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR RESPONDENT-APPELLANT

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
  Attorney General

Kyle D. Hawkins
Solicitor General

Ari Cuenin
Assistant Solicitor General
ari.cuenin@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Respondent-Appellant

# Certificate of Interested Persons

No. 19-51083

## Rosa Estella Olvera Jimenez,

*Petitioner – Appellee,*

*v.*

## Lorie Davis, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent – Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Ari Cuenin

Ari Cuenin
*Counsel of Record for
Respondent-Appellant*

# Statement Regarding Oral Argument

The State respectfully requests oral argument. Following a seven-day trial, a jury convicted petitioner Rosa Jimenez of felony murder and injury to a child and sentenced her to 75 and 99 years' imprisonment, respectively, and her conviction was affirmed on direct appeal. On postconviction review, the state-habeas court concluded that petitioner's trial counsel was not ineffective, *see Strickland v. Washington*, 466 U.S. 668 (1984), for failing to seek funding for multiple forensic experts under *Ake v. Oklahoma*, 470 U.S. 68 (1985). The district court below, however, declared that determination unreasonable and granted habeas relief. The district court, adopting a magistrate judge's recommendations, ordered the State to release or retry petitioner by February 25, 2020. The district court refused to stay its own order pending appeal. This Court then issued a stay to preserve the status quo.

Declaring an experienced, board-certified criminal-defense attorney's performance "incompetent" is a momentous charge. *See Harrington v. Richter*, 562 U.S. 86, 109 (2011). And labeling a state-habeas court's judgment so "unreasonable" that it cannot be accepted by "fairminded jurists" is more serious still. *See id.* at 102, 109. Nothing in the record supports either of those characterizations. The State respectfully submits that oral argument will significantly aid the Court's adjudication of this case.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ........................................................ii

Table of Authorities ................................................................................iv

Introduction ............................................................................................. 1

Statement of Jurisdiction ......................................................................... 3

Issues Presented ...................................................................................... 4

Statement of the Case .............................................................................. 4

    I.   Factual Background ........................................................................ 4

    II.  Trial ............................................................................................... 7

        A.  The State's case ................................................................... 9

        B.  The defense ....................................................................... 11

    III. Postconviction Proceedings ......................................................... 14

        A.  State-habeas proceedings ................................................... 14

        B.  The CCA's decision ........................................................... 16

    IV. The decision below ...................................................................... 17

Summary of the Argument ..................................................................... 17

Standard of Review ................................................................................ 19

Argument ............................................................................................... 19

    I.   Petitioner's Disagreement with the State-Habeas Court's
        Weighing of Conflicting Evidence Cannot Justify Federal-Habeas
        Relief. ......................................................................................... 19

    II.  The District Court Erred in Granting Relief Under *Strickland*. ............... 22

        A.  The magistrate judge identified no clearly established
            Supreme Court rule that the CCA could have violated. ..................... 22

            1.  *Hinton v. Alabama* was decided after the 2012 CCA ruling. ......... 23

            2.  *McWilliams v. Dunn* was also decided after the CCA ruled. ......... 23

            3.  *Ake v. Oklahoma* establishes no rule about forensic experts. ......... 24

            4.  *Strickland* does not clearly establish the rule petitioner
               seeks. ....................................................................................... 25

B. The CCA's decision was not contrary to or an unreasonable application of clearly established federal law under section 2254(d)(1). ........................................................................ 25

C. Relief was not warranted under section 2254(d)(2). ......................... 33

D. Petitioner cannot prevail even if AEDPA does not bar relitigation. ....................................................................... 39

III. Petitioner Is Not Entitled to Relief on Her *Ake* Claim. .............................. 44

A. Petitioner's *Ake* claim is procedurally defaulted and meritless. ..................................................................... 44

B. Relief is barred by *Teague v. Lane*. ....................................... 47

IV. Petitioner Is Not Entitled to Costs. ............................................. 48

Conclusion ........................................................................ 49

Certificate of Service ............................................................. 50

Certificate of Compliance ........................................................ 50

# Table of Authorities

**Page(s)**

Cases:

*Adekeye v. Davis*,
938 F.3d 678 (5th Cir. 2019) ............................................... 27

*Ake v. Oklahoma*,
470 U.S. 68 (1985) ...................................................*passim*

*Amos v. Thornton*,
646 F.3d 199 (5th Cir. 2011) .............................................. 27

*Barrett v. Acevedo*,
169 F.3d 1155 (8th Cir. 1999) ............................................. 44

*Batchelor v. Cain*,
682 F.3d 400 (5th Cir. 2012) .............................................. 45

*Bell v. Cone*,
535 U.S. 685 (2002) ................................................... 21, 40

*Blanton v. Quarterman*,
543 F.3d 230 (5th Cir. 2008) .............................................. 40

*Blue v. Thaler,*
   665 F.3d 647 (5th Cir. 2011) ............................................................ 33

*Brecht v. Abramson,*
   507 U.S. 619 (1993) .......................................................................... 46

*Brumfield v. Cain,*
   135 S. Ct. 2269 (2015) ................................................................. 34, 36

*Burt v. Titlow,*
   571 U.S. 12 (2013) .....................................................................1, 2, 21

*Busby v. State,*
   990 S.W.2d 263 (Tex. Crim. App.) ............................................. 27, 28

*Byrd v. Workman,*
   645 F.3d 1159 (10th Cir. 2011) ......................................................... 34

*Campbell v. Polk,*
   447 F.3d 270 (4th Cir. 2006) ............................................................. 25

*Cardenas v. Dretke,*
   405 F.3d 244 (5th Cir. 2005) ............................................................. 44

*Carter v. Davis,*
   946 F.3d 489 (9th Cir. 2019) ............................................................. 24

*Cavazos v. Smith,*
   565 U.S. 1 (2011) ............................................................................... 20

*Chaidez v. United States,*
   568 U.S. 342 (2013) .......................................................................... 47

*Clark v. Waller,*
   490 F.3d 551 (6th Cir. 2007) ............................................................. 34

*Coble v. Quarterman,*
   496 F.3d 430 (5th Cir. 2007) ............................................................. 41

*Coleman v. Thompson,*
   501 U.S. 722 (1991) .......................................................................... 48

*Conklin v. Schofield,*
   366 F.3d 1191 (11th Cir. 2004) ......................................................... 45

*Cullen v. Pinholster,*
   563 U.S. 170 (2011) ...............................................................1, 21, 30

*Dunn v. Madison,*
   138 S. Ct. 9 (2017) ............................................................................ 26

*Estelle v. McGuire,*
   502 U.S. 62 (1991) ........................................................................ 28-29

*Evans v. Cockrell,*
   285 F.3d 370 (5th Cir. 2002) ........................................................ 42

*Fairbank v. Ayers,*
   650 F.3d 1243 (9th Cir. 2011) ...................................................... 41

*Fay v. Noia,*
   372 U.S. 391 (1963) ........................................................................ 48

*Fox v. Ward,*
   200 F.3d 1286 (10th Cir. 2000) ............................................ 19, 32

*Garcia v. Stephens,*
   793 F.3d 513 (5th Cir. 2015) ........................................................ 29

*Gary v. Hall,*
   558 F.3d 1229 (11th Cir. 2009) .................................................... 24

*Gonzalez v. Crosby,*
   545 U.S. 524 (2005) ........................................................................ 48

*Grim v. Fisher,*
   816 F.3d 296 (5th Cir. 2016) ........................................................ 22

*Grisby v. Blodgett,*
   130 F.3d 365 (9th Cir. 1997) ........................................................ 42

*Grossman v. McDonough,*
   466 F.3d 1325 (11th Cir. 2006) .................................................... 41

*Harrington v. Richter,*
   562 U.S. 86 (2011) ................................................................*passim*

*Harris v. Thaler,*
   464 F. App'x 301 (5th Cir. 2012) ................................................ 25

*Hinton v. Alabama,*
   571 U.S. 263 (2014) ...................................................20, 23, 26, 41

*Hood v. Dretke,*
   93 F. App'x 665 (5th Cir. 2004) .................................................. 45

*Horn v. Banks,*
   536 U.S. 266 (2002) ........................................................................ 47

*Isaac v. Cain,*
   588 F. App'x 318 (5th Cir. 2014) ................................................ 45

*Jackson v. Ylst,*
   921 F.2d 882 (9th Cir. 1990) ........................................................ 48

*Jimenez v. State,*
   240 S.W.3d 384 (Tex. App.—Austin 2007, pet. ref'd) ..............13, 14

*Ex parte Jimenez*,
    364 S.W.3d 866 (Tex. Crim. App. 2012) ......................................*passim*
*Joseph v. Angelone*,
    184 F.3d 320 (4th Cir. 1999) ........................................................24-25
*King v. Davis*,
    883 F.3d 577 (5th Cir. 2018) ............................................................. 46
*Knowles v. Mirzayance*,
    556 U.S. 111 (2009) ................................................................... 21, 40
*LaHood v. Davis*,
    653 F. App'x 253 (5th Cir. 2016) .................................................... 35
*Langley v. Prince*,
    No. 19-6413 (U.S. Apr. 20, 2020) ................................................... 21
    926 F.3d 145 (5th Cir. 2019) .........................................................*passim*
*Martin v. Cain*,
    246 F.3d 471 (5th Cir. 2001) ............................................................ 34
*McWilliams v. Dunn*,
    137 S. Ct. 1790 (2017) ..................................................... 23, 24, 27
*Meanes v. Johnson*,
    138 F.3d 1007 (5th Cir. 1998) ......................................................... 25
*Modden v. Johnson*,
    252 F.3d 436 (5th Cir. 2001) .............................................. 25, 46, 47
*Moore v. Kemp*,
    809 F.2d 702 (11th Cir. 1987) ......................................................... 45
*Murphy v. Davis*,
    901 F.3d 578 (5th Cir. 2018) ........................................................... 46
*Murray v. Carrier*,
    477 U.S. 478 (1986) .......................................................................... 44
*Nelson v. Davis*,
    952 F.3d 651 (5th Cir. 2020) ........................................................... 41
*Nickleson v. Stephens*,
    803 F.3d 748 (5th Cir. 2015) ........................................................... 40
*Norris v. Davis*,
    826 F.3d 821 (5th Cir. 2016) ........................................................... 19
*O'Dell v. Netherland*,
    521 U.S. 151 (1997) .......................................................................... 47

*O'Quinn v. Spiller,*
    806 F.3d 974 (7th Cir. 2015) ............................................................... 34
*Ogan v. Cockrell,*
    297 F.3d 349 (5th Cir. 2002) ............................................................... 19
*Ouber v. Guarino,*
    293 F.3d 19 (1st Cir. 2002) .................................................................. 34
*Page v. Lee,*
    337 F.3d 411 (4th Cir. 2003) ............................................................... 42
*Pierre v. Vannoy,*
    891 F.3d 224 (5th Cir. 2018) ............................................................... 23
*Pondexter v. Quarterman,*
    537 F.3d 511 (5th Cir. 2008) ............................................................... 39
*Proctor v. Cockrell,*
    283 F.3d 726 (5th Cir. 2002) ............................................................... 23
*Reed v. Stephens,*
    739 F.3d 753 (5th Cir. 2014) ............................................................... 20
*Renico v. Lett,*
    559 U.S. 766 (2010) .............................................................................. 1
*Rey v. State,*
    897 S.W.2d 333 (Tex. Crim. App. 1995) ........................................ 2, 28
*Rice v. Collins,*
    546 U.S. 333 (2006) ............................................................................ 22
*Sexton v. Beaudreaux,*
    138 S. Ct. 2555 (2018) ................................................................ *passim*
*Smith v. Davis,*
    927 F.3d 313 (5th Cir. 2019) ............................................................ 4, 28
*Smith v. Murray,*
    477 U.S. 527 (1986) ............................................................................ 28
*Soffar v. Dretke,*
    368 F.3d 441 (5th Cir. 2004) ............................................................... 31
*Strickland v. Washington,*
    466 U.S. 668 (1984) .................................................................... *passim*
*Teague v. Lane,*
    489 U.S. 288 (1989) ............................................... 18, 39, 47, 48
*Thomas v. Vannoy,*
    898 F.3d 561 (5th Cir. 2018) .............................................................. 36

*Turner v. Quarterman,*
 481 F.3d 292 (5th Cir. 2007) ........................................... 25, 28, 39, 40

*Tyler v. Cain,*
 533 U.S. 656 (2001) ........................................................... 47

*United States v. Bourgeois,*
 537 F. App'x 604 (5th Cir. 2013) ........................................ 43

*United States v. Causey,*
 568 F. App'x 269 (5th Cir. 2014) ..................................... 23, 31

*United States v. Cronic,*
 466 U.S. 648 (1984) .......................................................... 33

*United States v. Smith,*
 135 F.3d 963 (5th Cir. 1998) ............................................ 32

*Verrett v. Vannoy,*
 No. CV19-0351, 2019 WL 3802454 (E.D. La. Aug. 13, 2019) ........................... 24
 No. CV19-0351, 2019 WL 3805178 (E.D. La. July 29, 2019) ........................... 24

*Wadsworth v. Johnson,*
 235 F.3d 959 (5th Cir. 2000) ............................................... 3

*Walker v. Martin,*
 562 U.S. 307 (2011) .......................................................... 44

*Weeks v. Angelone,*
 528 U.S. 225 (2000) .......................................................... 48
 176 F.3d 249 (4th Cir. 1999) ............................................ 48

*White v. Johnson,*
 153 F.3d 197 (5th Cir. 1998) ............................................ 46

*White v. Woodall,*
 572 U.S. 415 (2014) .......................................................... 27

*Williams v. Taylor,*
 529 U.S. 362 (2000) ................................................. 23, 26, 27, 42

*Wood v. Allen,*
 558 U.S. 290 (2010) ..................................................... 34, 36

*Woods v. Donald,*
 575 U.S. 312 (2015) ..................................................... 26, 27

*Yarborough v. Alvarado,*
 541 U.S. 652 (2004) .......................................................... 21

*Zimmerman v. Cockrell,*
 69 F. App'x 658 (5th Cir. 2003) ........................................ 39

**Constitutional Provision, Statutes, and Rules:**

U.S. Const. amend. VI ...................................................................................40

28 U.S.C.:

    § 1331 .................................................................................................... 3

    § 2241(c)(3) .......................................................................................... 48

    § 2253(a) ................................................................................................ 4

    § 2254 .................................................................................................... 3

    § 2254(a) .............................................................................. 19, 20, 39

    § 2254(d) ................................................................................................ 1

    § 2254(d)(1) ................................................................ 25, 26, 27, 34

    § 2254(d)(1)-(2) .................................................................................. 22

    § 2254(d)(2) ................................................................ 33, 34, 35, 36

    § 2254(e)(1) ................................................................................. 19, 33

Fed. R. Civ. P.:

    6(b)(1)(B) ............................................................................................. 48

    54(d)(1) ................................................................................................. 48

    81(a)(4) ................................................................................................. 48

    81(a)(4)(A)-(B) .................................................................................... 48

Rules Governing Section 2254 Cases, Rule 12 .......................................... 48

## Introduction

Petitioner's request for federal-habeas relief depends on demonstrating that she received ineffective assistance of trial counsel. The Texas Court of Criminal Appeals (CCA) has already considered petitioner's ineffective-assistance claim and unanimously rejected it on the merits. The Antiterrorism and Effective Death Penalty Act (AEDPA) "prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Supreme Court precedent prevents federal courts "second-guess[ing] the decisions of . . . defense attorneys." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). When, as here, federal courts review a state-court conclusion that defense counsel provided reasonable representation, they apply a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In granting habeas relief for petitioner, a convicted child murderer serving a 99-year sentence, the district court gave short shrift to these principles.

Petitioner cannot overcome AEDPA's relitigation bar, 28 U.S.C. § 2254(d), which requires her to show that the CCA's judgment was an "extreme malfunction[]" so "unreasonable" that it cannot be accepted by "fairminded jurists," *Richter*, 562 U.S. at 102. That is almost impossible to do in a case like this, which involves a routine ineffective-assistance-of-counsel claim. *See Titlow*, 571 U.S. at 19. Because this "case involves such a common claim as ineffective assistance of counsel under *Strickland*—a claim state courts have now adjudicated in countless criminal cases for nearly 30 years—there is no intrinsic reason" to think the district court rendered a

"more competent, or conscientious, or learned" decision than the CCA. *Id.* (cleaned up).

In granting relief, the district court necessarily found the judges of the CCA who rejected petitioner's *Strickland* claim on the merits so incompetent that no reasonable judge could agree with their decision. In truth, the district court merely disagreed with petitioner's convictions and reverse-engineered a constitutional violation from debatable inferences about various medical opinions. The court embraced the idea that the jury should have heard from different experts and worked backward from there. The court emphasized the most favorable parts of petitioner's case and highlighted weaknesses in the defense's trial presentation, finding the path of least resistance in petitioner's court-appointed forensic expert. Nothing required the CCA to share the district court's view of the record. Petitioner's additional medical experts cannot rule out intentional injury or explain the fatal choking of her victim in a way that fits all the evidence. There is no new evidence explaining how a 21-month-old boy wadded up five attached, intact paper towels and choked himself to death.

The district court went on to dramatically expand an indigent defendant's due process right to experts beyond what the Supreme Court has ever required. Under *Ake*, a defendant is entitled to an independent psychological examination to assist him in "a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83. Texas has extended *Ake* to some cases involving non-psychiatric experts. *See Ex parte Jimenez*, 364 S.W.3d 866, 877 & n.30 (Tex. Crim. App. 2012) (citing *Rey v. State*, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995)). But *Ake* itself covers the "basic tools" of a defense—

the State need not provide an indigent defendant with all the expert assistance that a wealthier counterpart might buy. 470 U.S. at 77.

Petitioner's trial counsel worked diligently to secure State funding for experts, and retained an experienced forensic pathologist and medical examiner who was "ideally situated" to assist the defense and willing to take a court-appointed case. *Jimenez*, 364 S.W.3d at 884. The CCA found counsel's performance competent in that respect. *Id.* at 884-86. Petitioner's state-habeas lawyers later found a team of other experts paid for by private parties, and petitioner argues that these experts were better than her State-funded forensic pathologist. But the CCA explained that she, like any other indigent defendant, is not entitled to the experts of her choosing, let alone a multidisciplinary "'team of experts' paid for by the taxpayers." *Id.* at 877, 887-88. By rejecting the CCA's reasonable analysis, the district court has invented, for the first time, a due process right to multiple taxpayer-funded forensic experts at trial, vitiating the respect for the state criminal-justice system demanded by AEDPA. The Court should reverse and render judgment for the State.

## STATEMENT OF JURISDICTION

Petitioner was tried, convicted, and confined within the geographical bounds of the Western District of Texas. ROA.1213-14, 1277-79, 1306-11. She timely petitioned for a writ of habeas corpus through counsel in that court on April 26, 2012. ROA.11-73. The court properly exercised jurisdiction. 28 U.S.C. §§ 1331, 2254; *see Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000). On September 10, 2018, the magistrate judge recommended granting relief, ROA.911-12, which the district court adopted on October 28, 2019, ROA.1036-38. That day, the court issued final

judgment disposing all claims. ROA.1039. On November 22, 2019, the State filed a Federal Rule of Civil Procedure 59(e) motion. ROA.1040-45. The State noticed its appeal on November 25, 2019. ROA.1063-65. The court dismissed the Rule 59(e) motion on January 24, 2020. ROA.1157-58. A certificate of appealability is unnecessary. *Smith v. Davis*, 927 F.3d 313, 320 (5th Cir. 2019). Jurisdiction exists under 28 U.S.C. § 2253(a).

## Issues Presented

1. The CCA determined that petitioner received constitutionally adequate assistance of counsel. Was that conclusion contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state-habeas proceedings? And, if so, is petitioner entitled to habeas relief on her ineffective-assistance claim?

2. Has petitioner demonstrated cause and prejudice to overcome the procedural default of her *Ake* claim and, if so, is she entitled to relief on that claim?

3. Did the district court err in awarding costs?

## Statement of the Case

### I.  Factual Background

One morning in January 2003, a mother dropped off her healthy son, B.G., at petitioner's apartment. ROA.1869-73. Petitioner would babysit 21-month-old B.G. two or three times a week while also taking care of her own one-year-old daughter. ROA.1862-65. That afternoon, petitioner appeared at her neighbor's door holding

B.G. ROA.1920-21. He was "limp and purple" and looked dead. ROA.1943-44. Petitioner told her neighbor she thought B.G. was choking, but she couldn't feel anything in his mouth. ROA.1927-28. The neighbor saw nothing in B.G.'s mouth and felt nothing with her finger. ROA.1921-25. Another neighbor arrived and called 911 at 1:28 p.m. ROA.1894, 1899, 2488. Initially the caller said that B.G. was unconscious and not breathing but that she could not find an object in his mouth. ROA.1897. Then she said B.G. looked like he was trying to vomit. ROA.1896-98.

Officer William Torres arrived at 1:31 p.m. ROA.1947-54. He checked B.G. but detected no breath or a pulse. ROA.1960-61, 1981-83. B.G.'s lips were blue and he had blood on his cheek. ROA.1938-39, 1960-62, 1981-82. Torres could tell B.G.'s airway was obstructed but felt nothing in B.G.'s mouth. ROA.1960-64.

Two paramedics arrived around 1:32 or 1:33 p.m. ROA.2016-18, 2033-36, 2067-68. One observed that B.G. was unconscious, not breathing, and pulseless. ROA.1999-2004, 2035. She tried to ventilate B.G. unsuccessfully. ROA.2000-04, 2022-23, 2036.

The other paramedic attempted to intubate B.G. between 1:37 and 1:39 p.m., but saw a large, reddish mass blocking the airway. ROA.2004-05, 2030-37. He pulled it out with forceps, clearing B.G.'s airway at 1:39 p.m. ROA.2008-10, 2030. It was a big wad of tightly rolled up, blood-soaked paper towels the size of a large egg. ROA.1944, 1989-90, 2008-15, 2023-24. It was so large that B.G.'s head had to be held down to keep it from lifting off the ground as the paramedic removed it. ROA.2009, 2038, 2679. Paramedics successfully intubated B.G. at 1:43 p.m. and

restarted his heart. ROA.2005-07, 2029. They arrived at the E.R. around 2 p.m. ROA.2011, 2389.

That afternoon, a police crime-scene specialist documented the mass. ROA.2039-40, 2048-49, 2140-47, 2179, 3250-74. It was about three inches by three inches, and nearly two inches thick, at its widest points. ROA.2170. The wad was still wet with blood, which DNA testing confirmed was B.G.'s. ROA.2163-64, 2447.

Back at the apartments, petitioner told Officer Torres that she was cooking and called to B.G. to bring her the roll of paper towels, but he did not respond. ROA.1975. She told Torres that she went to look for him and only then found him "laying down" unconscious, "and he was not breathing." ROA.1976-68.

Petitioner voluntarily agreed to talk to detectives at the police station. ROA.2252, 2299. Sergeant Eric De Los Santos interviewed petitioner in Spanish and videotaped the conversation. ROA.2252-54. At one point, petitioner asked to speak to De Los Santos outside, which he recorded. ROA.2255-56.

Petitioner told De Los Santos that B.G. was sick, so she blew his nose with a paper towel from a roll she left on the sofa. ROA.2270. This time, she said she was leaving the kitchen to check the children when she saw B.G. walking toward her from the bedroom with his hand to his neck, his lips purple. ROA.2271. She denied checking B.G.'s mouth with her fingers. ROA.2271-72, 3506, 3516. Later, however, petitioner admitted she did, and that B.G. had bitten her finger. ROA.2272-73, 2329, 3517-22, 3538. She also initially claimed she immediately took B.G. to her neighbor's apartment, but later admitted she had taken B.G. into the bathroom because he looked like he was trying to vomit, and that B.G. had a "trickle" of blood on his

mouth when she tried opening it. ROA.3521, 3541, 3547-48, 3565-66. She insisted it was still only a minute between when she found B.G. and when she went to her neighbor. ROA.3566.

Later, petitioner asked to speak to De Los Santos outside "as a friend." ROA.2275, 3613-15. Petitioner asked De Los Santos, "If I . . . were to tell you . . . that I did it . . . what would happen?" ROA.3664 (ellipses original). She wondered, "If they were to lock me up, for how long?" ROA.2278, 3664-65. Petitioner also led De Los Santos to believe she would tell him what really happened if she got to see her daughter at the police station, which he arranged. ROA.2278-80, 2292, 3617-28, 3649-54. When De Los Santos asked petitioner to tell him what happened, however, she responded, "I can't." ROA.2292, 3658. De Los Santos drove petitioner home, where she was arrested several hours later. ROA.2257, 3643.

That night, B.G.'s mother visited him at the hospital. ROA.1875-76. B.G. had suffered serious brain damage and was being kept alive with a ventilator, but he would never recover. ROA.1875-78, 2349-50. His mother made the difficult decision to have the ventilator removed. ROA.1876-78, 2352-53. B.G. lived in a hospice until April 2003. ROA.2468. An autopsy confirmed that B.G.'s death was a homicide caused by brain damage from lack of oxygen. ROA.2475, 2481.

## II.  Trial

Petitioner was indicted for injury to a child, and appointed counsel in February 2003. ROA.1395, 1405. She was re-indicted for felony murder after B.G. died. ROA.1213-16. Petitioner's trial began in August 2005. ROA.1584.

Before trial, defense counsel took steps to secure expert assistance. Counsel filed a motion to retain an expert witness on child behavior, citing *Ake*. ROA.1421-22. Counsel filed separate motions to retain an expert in child abuse and family violence, ROA.1449-50; a criminalist or forensic scientist, ROA.1445-46; a "simulation or re-enactment expert," ROA.1453-54; and an expert in forensic medicine to help counsel "prepare for the State's medical experts who will testify that the child could not have choked accidentally." ROA.1457-48. The trial court entered a written order granting the motion seeking funding for a forensic expert. ROA.1460.

With State funding, counsel retained forensic pathologist Dr. Ira Kanfer. ROA.3942, 3988. Counsel hired Dr. Kanfer after another forensic pathologist, Dr. Linda Norton, was unwilling to take an appointed case. ROA.4227. Counsel also retained Keith Kristelis, "a very able graphic and simulation expert." ROA.3935. Counsel would use the testimony of Dr. Kanfer and demonstratives prepared by Kristelis to "demonstrate how the accident could have happened." ROA.3939. Counsel also retained Dr. George Parker, "an experienced psychologist who took court appointed cases," to testify about child development and characteristics of child abusers, but ultimately decided not to call him. ROA.3935, 3939, 3967. Counsel also consulted with Dr. George Edwards, the Director of Pediatric Education at Brackenridge Hospital in Austin, ROA.3959, 3969, 3971, 3981-82, 3991-92, and with Dr. Frank McGeorge, an emergency-medicine specialist with expertise in choking, ROA.3937. Counsel would have liked to retain Dr. McGeorge and other experts in "biomechanical engineering, human factors research, and child development," but found them cost-prohibitive and unwilling to take appointed cases. ROA.3938.

8

## A. The State's case

The State presented fact witnesses including B.G.'s mother, petitioner's neighbors, the 911 operator, the paramedics, and the responding officers. The paramedics were shocked by the size of the mass and how far it was down B.G.'s airway, and that it was paper towels, not a toy or food. ROA.2013-14, 2047.

A detective testified about searching petitioner's apartment. ROA.2183-84. He found blood on the bathroom faucet and a blood smear on the bathtub. ROA.2206-12. There was yellowish liquid in the tub, but it did not look like someone had bathed. ROA.2210. DNA testing revealed the blood was B.G.'s. ROA.2447-48.

The police crime-scene specialist testified about documenting the paper-towel wad. ROA.2149-50, 3250-74. She also documented the condition of petitioner's hands that day, observing what appeared to be injuries on petitioner's fingers. ROA.2156-59, 3305-31. The jury watched a video of the wad being opened in the crime lab. ROA.2441-45.

The 911 operator, who was a certified EMT, recounted the caller's description that B.G. appeared to be gagging or gasping. ROA.1896-98, 1902. She explained that laypersons will often mistake "agonal respirations" (a kind of gasping) for breathing, and this was likely what the caller witnessed since B.G.'s airway was blocked. ROA.1896-99.

The jury heard testimony from De Los Santos about petitioner's interview. ROA.2247-57, 2265-94. The jury viewed the entire conversation along with a Spanish/English transcription. ROA.2268, 2277, 3477-672. The jury could thus see officers making sure petitioner was comfortable. ROA.2254, 3477, 3482, 3487, 3581,

3612, 3633-34. Petitioner was repeatedly told she was not under arrest and was free to leave. ROA.2254-57, 3581, 3614, 3643, 3658.

Dr. Elizabeth Peacock, a forensic pathologist and deputy medical examiner, testified about B.G.'s autopsy, which was performed by a now-retired deputy medical examiner, Dr. Vladimir Parungao. ROA.2472-73, 3707-09. She shared Dr. Parungao's conclusion that B.G.'s death was a homicide. ROA.2474-75, 2481.[1]

The State also presented testimony from B.G.'s treating physicians. Dr. John Boulet, a board-certified pediatric emergency-care physician with over thirteen years' experience, testified about treating B.G. in the emergency room. ROA.2079-82. B.G.'s blood gasses indicated he had been without oxygen for a long time. ROA.2093. He believed it was unlikely, if not impossible, for a child as young as B.G. to have forced so many paper towels down his own throat. ROA.2083-88.

Dr. Patricia Oehring, the pediatric ICU physician who treated B.G., testified similarly. ROA.2360. She explained that, unlike with slippery items like buttons or coins that might slide down the throat, B.G. could not have forced the towels down his own throat without pain and his gag reflex stopping him. ROA.2361-64. She confirmed that B.G. suffered a brain injury when the wad blocked his airway for a long time. ROA.2345-46. B.G.'s blood-gas levels, and the fact that his heart had stopped,

---

[1] The magistrate judge states that Dr. Parungao "told [a] defense investigator he specified 'homicide' as the manner of death because 'he received information from either the police or the media that led him to believe—that told him that it was a homicide.'" ROA.877 n.13 (quoting ROA.2840). Dr. Parungao denied this. ROA.2664, 2668-69. The magistrate judge referenced the defense investigator's testimony but not Dr. Parungao's denial.

meant B.G.'s brain had been deprived of adequate oxygen for thirty to forty minutes, which was inconsistent with petitioner's claim that she rushed to get help as soon as she noticed B.G. choking. ROA.2345-49.

The State argued that a theory of intentional choking made more sense and fit all the evidence better than accidental choking. ROA.2952-55. The State corroborated this with petitioner's inconsistent stories about finding B.G., incriminating statements to Officer De Los Santos, and evidence suggesting that petitioner sanitized the crime scene. ROA.2951-54. The State cited the bite mark on petitioner's hand and B.G.'s blood in the bathroom as evidence of force. ROA.2951-55.

## B.  The defense

The defense's strategy was to discredit the State's medical evidence and timeline. ROA.3939-40. The defense adduced testimony from family and acquaintances to show that petitioner was not the type of person who would abuse a child. ROA.3939. The defense also called a witness who testified that her daughter had choked on tissues when she was approximately B.G.'s age. ROA.2495-96.

The defense presented expert testimony from Dr. Kanfer, a forensic pathologist. He was twenty-year medical examiner for the state of Connecticut and had testified in about 350 cases. ROA.2513-14, 2528-29. He also taught medical residents about findings in child-abuse cases, and he had on "multiple occasions" testified that a child's manner of death was homicide. ROA.2536-37, 2625-27. He also examined "[d]ozens and dozens" of live children for state authorities who suspected child abuse. ROA.2630. Dr. Kanfer also had decades of experience in general and emergency medicine as a U.S. Army reservist and was called up for active duty to serve

around the world. ROA.2528-31. On voir dire, the trial court explained, "obviously, this gentleman's going to be able to testify. . . . [T]his isn't a close call so . . . it should be apparent to everyone." ROA.2520.

Dr. Kanfer opined that B.G.'s choking was accidental. ROA.2528-69, ROA.2590-657, 2783-811. Dr. Kanfer offered his opinion after reviewing photographs, reports, medical records, and other materials provided by the defense, watching the crime-lab video examining the wad, conducting online research on similar choking incidents, consulting colleagues, and talking to the prosecutor. ROA.2521, 2531, 2534-36, 2590, 2605-06, 2612-16. He also did an experiment to test his theory by wadding up five paper towels, wetting them, and compressing them into a wad small enough to pass through an opening that represented a choking-hazard diameter, and thus small enough to choke on accidentally. ROA.2558-59. This explanation tracked testimony from B.G.'s mother that he liked to put things in the toilet, and had once dropped in a whole roll of toilet paper. ROA.1869-71, 2789, 2811.

Dr. Kanfer explained that if someone had forced five paper towels down B.G.'s throat, there should have been evidence of trauma to B.G.'s mouth. ROA.2533, 2554. The absence of damage to B.G. or the towels was the "crucial" evidence of an accident. ROA.2533-34, 2554. Dr. Kanfer suggested that attempts to resuscitate B.G. may have accidentally driven the wad farther down his throat, making the obstruction worse. ROA.2598-603. He thought the blood on the wad was consistent with pulmonary edema, a reaction that can occur when a person is choking. ROA.2561-62. Dr. Kanfer also explained that when a person's airway is completely blocked, the

12

heart cannot continue to beat for more than four to five minutes and "purposeful movement" lasts only a minute or two. ROA.2542-43, 2802.

The defense next called the State's expert, Dr. Randall Alexander, a board-certified pediatrician, as a hostile witness. Dr. Alexander largely agreed with the testimony of B.G.'s treating physicians. ROA.2683, 2716-40. But he agreed with Dr. Kanfer that if a child's airway is completely blocked, his heart could not continue to beat for nearly an hour, as Dr. Oehring's testimony suggested. ROA.2686, 2735-36. He also disagreed that the wad was "blood soaked" and offered some support for Dr. Kanfer's opinion that the stains were not from trauma. ROA.2686-87, 2772-73. The defense recalled Dr. Kanfer to respond to Dr. Alexander. ROA.2783-811.

At some point during a break in Dr. Kanfer's testimony and outside the presence of the jury, Dr. Kanfer "made a rather contemptuous comment about the prosecutors, which included the use of a profane verb." *Jimenez v. State*, 240 S.W.3d 384, 403 (Tex. App.—Austin 2007, pet. ref'd). The prosecutor brought this incident to the jury's attention. ROA.2657, 2804. Defense counsel objected to the State "getting into the personal thing any more." ROA.2804. The judge overruled the objection. ROA.2805.

Defense counsel argued that the evidence was consistent with an accident, not homicide, and that the jury should discredit the State's medical evidence. ROA.2896-940. He noted that both sides' witnesses disagreed with Dr. Oehring's theory of how long B.G. lacked oxygen. ROA.2920-26, 2934-39. Counsel argued that the State's medical witnesses were biased from emotion, ROA.2912, 2920, and that Dr. Alexander was less prepared than Dr. Kanfer, ROA.2911-12, 2925-28. Counsel

argued that if the paper towels had been forced down B.G.'s throat, there should have been injury to the child's face or mouth, more injuries to petitioner than just a small bite, and damage to the towels from B.G.'s teeth. ROA.2925-26. Counsel suggested that inconsistencies in petitioner's statements were minor and any incriminating statements could be attributed to trauma and aggressive questioning. ROA.2905-06, 2913-20.

The jury found petitioner guilty, sentencing her to 75 years for murder and 99 years for injury to a child. ROA.1277-86, 1306-11. Petitioner, through appointed counsel, filed a motion for a new trial arguing, *inter alia*, that trial counsel rendered ineffective assistance. ROA.1354-64. After a hearing, ROA.3096-183, the trial judge denied it. ROA.1377.

The Third District Court of Appeals affirmed on direct review. *Jimenez*, 240 S.W.3d at 387; *see also id.* at 403 (holding that cross-examining Dr. Kanfer about his off-the-record exchange with prosecutors was permissible because his "admitted use of profanity when referring to the prosecutors revealed potential animosity toward the prosecutors.").

## III. Postconviction Proceedings

### A. State-habeas proceedings

In October 2009, petitioner filed a state-habeas application. ROA.3790-801. In October 2010, through new counsel, she filed a supplement claiming "actual innocence" based on additional expert opinions that B.G. could have choked accidentally. ROA.4122-32, 4165-74. Petitioner also argued that trial counsel's

performance deprived her of the effective use of an expert to which she was constitutionally entitled, citing *Ake v. Oklahoma*, and that she was denied the necessary funds for adequate expert assistance in violation of *Ake*. ROA.4174-82. State-habeas counsel supported these arguments with affidavits from three new experts on pediatric choking retained for petitioner by private parties. ROA.874 & n.12, 4191-214.

The state-habeas trial court held a four-day hearing in December 2010. ROA.4496-5029. The case was assigned to Judge Charlie Baird, as the judge who presided over petitioner's trial had retired. ROA.171-90. Petitioner presented testimony of two pediatric specialists from the Children's Hospital of Philadelphia, Dr. Karen Zur, a pediatric otolaryngologist, ROA.4501-649, and Dr. John McCloskey, a pediatric anesthesiologist and critical-care specialist, ROA.4777-909. She also submitted an affidavit from Dr. Janice Ophoven, a self-described "pediatric" forensic pathologist. ROA.4255-64. Judge Baird rushed the proceedings to finish by December 31, 2010, his last day in office, which prevented the State to cross-examining Dr. Ophoven and developing a full habeas record. ROA.5664-67.

Several of the original trial witnesses testified during the habeas hearing and reaffirmed their prior testimony, including the paramedic who removed the wad from B.G.'s throat (who confirmed he did not damage B.G.'s airway), Dr. Oehring (now known as Dr. Aldridge), and Dr. Peacock, the medical examiner. ROA.4655-771, 4929-78, 4983-5008. Dr. Alexander also submitted an affidavit reaffirming his trial testimony. ROA.5081-85. The State also called Dr. James Eskew, an otolaryngologist, who stated that he did not believe that B.G. choked accidentally. ROA.4909-29.

Judge Baird proposed findings of fact and conclusions of law and recommended that the CCA grant a new trial. ROA.4465-84. He made findings concerning petitioner's three state-habeas experts, their credentials, their opinions, and the factual bases for their opinions. ROA.4466-72. He found the experts credible, and the State's experts did not "rebut" their conclusions. ROA.4468-75.

Judge Baird found that these experts provided additional accounts of children who had accidentally ingested foreign objects. ROA.4466-72. The experts also opined that the inconsistencies in petitioner's statements were not evidence of child abuse. ROA.4470, 4472. And B.G. lacked "suspicious injuries" around his throat or face, which he would have if someone killed him. ROA.4471. The state-habeas judge also believed the experts were more highly qualified than Dr. Kanfer to opine on some aspects of this case. ROA.4468, 4471.

Because petitioner merely challenged the credibility of dueling experts, however, Judge Baird rejected petitioner's actual-innocence claim. ROA.4478-79. The state-habeas opinions did not constitute "newly discovered evidence under actual innocence jurisprudence because they rely on the same evidence as that available at the time of trial" and "merely presented a differing interpretation." ROA.4478. Moreover, petitioner had not shown by clear and convincing evidence that no juror would have convicted her because she only "offers a differing view of the medical evidence from that presented by the State." ROA.4478.

## B.  The CCA's decision

The CCA agreed "with some of the habeas judge's factual findings" but refused to "adopt them all because some of them are not supported by both the trial and

habeas records." *See Jimenez*, 364 S.W.3d at 869. The CCA adopted the recommendation and denied relief on petitioner's "actual innocence" claim. *Id.* at 876. But it found that trial counsel reasonably retained and presented Dr. Kanfer to opine about whether B.G. choked accidentally. *Id.* at 886. The CCA rejected the two claims at issue here. The CCA held that the challenge to the denial of additional funding under *Ake* was procedurally barred by contemporaneous-objection rules, as trial counsel preserved no record of requesting such funding. *Id.* at 882. The CCA rejected petitioner's related ineffective-assistance claim on the merits, holding that counsel's failure to preserve a claim for additional funding did not violate the Constitution. *Id.* at 888.

## IV. The decision below

On federal-habeas review, the district court rejected the CCA's adjudication of petitioner's claims. The magistrate judge entered a Report and Recommendation finding that petitioner was entitled to relief on her ineffective-assistance claim, ROA.885-903, that the *Strickland* violation constituted cause and prejudice to overcome the default of the *Ake* claim, and that the trial court violated *Ake* in failing to provide petitioner additional expert funding, ROA.903-09. The district court adopted the recommendations and granted relief. ROA.1036-38.

## SUMMARY OF THE ARGUMENT

Petitioner asserts due process and ineffective-assistance claims, both of which turn on her alleged right to multiple State-funded forensic experts at a noncapital-murder trial. In her due process claim, petitioner argues that she was constitutionally

entitled to additional forensic-expert funding under *Ake* for a "multidisciplinary team of experts," including a pediatric airway specialist, a pediatric critical-care physician, and a pediatric forensic pathologist. *Jimenez*, 364 S.W.3d at 874, 888. In her *Strickland* claim, petitioner contends trial counsel was ineffective for failing to preserve that argument.

The key fact question at trial was whether the cause of B.G.'s death was accidental—whether a not-even-two-year-old toddler managed to wad up a string of five intact paper towels and choke himself to death, or whether petitioner forced them into the boy's mouth. Petitioner had a state-funded forensic expert at trial—forensic pathologist Dr. Ira Kanfer—who had testified in about 350 trials and had experience with pediatric cases. Dr. Kanfer testified that the choking was accidental and described how it could have happened. *Id.* at 884. The defense offered his testimony to cast doubt on the State's theory that B.G.'s injuries could not have been accidental, but the jury agreed with the State and convicted petitioner. *Id.* at 870-71. Texas courts upheld petitioner's convictions on direct and collateral review.

The district court, however, granted habeas relief. This was error because petitioner's arguments are not grounds for federal-habeas relief, and disputes about debatable inferences from the record cannot overcome the apex deference owed to state courts under AEDPA. Petitioner is not entitled to relief on her *Strickland* claim because the CCA's analysis easily clears AEDPA's high bar and because it is meritless. That result forecloses relief on petitioner's procedurally defaulted *Ake* claim, which would also fail on the merits or under the retroactivity principles articulated in *Teague v. Lane*, 489 U.S. 288 (1989). Finally, petitioner was not entitled to costs.

## STANDARD OF REVIEW

The judgment is reviewed de novo. *Ogan v. Cockrell*, 297 F.3d 349, 355-56 (5th Cir. 2002). State-court factual findings "are presumed correct unless the petitioner can show by clear and convincing evidence that the presumption should not apply." *Norris v. Davis*, 826 F.3d 821, 827-28 (5th Cir. 2016) (citing 28 U.S.C. § 2254(e)(1)).

## ARGUMENT

Trial counsel was not ineffective because his performance reasonably reflected the relevant law on the expert funding that was available to his client, and any error was not prejudicial. AEDPA's relitigation bar does not allow a federal court to overturn the CCA's reasonable decision. Petitioner is not entitled to relief on her *Ake* claim because there is no basis to overcome the default of that claim, which is also meritless. Finally, the district court should not have awarded costs.

## I. Petitioner's Disagreement with the State-Habeas Court's Weighing of Conflicting Evidence Cannot Justify Federal-Habeas Relief.

Petitioner cannot obtain federal-habeas relief because she merely challenges the CCA's weighing of conflicting evidence, which is no basis for federal-habeas relief. Federal courts may consider a state prisoner's habeas application only on the basis that she "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Whether one set of experts was more "persuasive" and "credible" than another is no basis for federal-habeas relief. ROA.887-88, 890. Questions about the weight of evidence and credibility of experts are matters of state law, not grounds for federal habeas. *See, e.g.*, *Fox v. Ward*, 200 F.3d 1286, 1297 (10th Cir. 2000). The Supreme Court has declined to "launch federal courts into

examination of the relative qualifications of experts hired and experts that might have been hired." *Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014) (per curiam).

The underlying theme of petitioner's arguments is that she is actually innocent and thus entitled to whatever basis for relief can be made to fit. But the state-habeas trial judge found that the actual-innocence claim "lack[s] merit," ROA.4479, and the CCA agreed, *Jimenez*, 364 S.W.3d at 875 & n.17. Her evidence is neither new nor "medically indisputable." ROA.4478. Nor is actual innocence a standalone basis for habeas relief. *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014). The magistrate judge believed jurors hearing the state-habeas experts would not have returned the same verdict. ROA.892. Even if that were true, it does not establish the necessary condition for federal-habeas relief. *See* 28 U.S.C. § 2254(a).

The magistrate judge was swayed by two judges' doubts about petitioner's conviction: the state-habeas trial judge, and petitioner's retired trial judge, who complained to the District Attorney about the CCA's ruling. ROA.891-92, 903-04, 908-09. But eight CCA judges have unanimously reached the opposite result, and federal courts are not clemency boards. Because "rational people can sometimes disagree, the inevitable consequence of [AEDPA] is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

The magistrate judge repeatedly cited what he believed was among the "best" (ROA.892, 893) evidence of prejudice: a letter from the retired trial judge to the District Attorney lamenting the CCA's ruling. ROA.5722-23. But AEDPA bars consideration of this letter because it is outside "the record that was before the state court

that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180. At any rate, the magistrate judge ignored the letter's most relevant part: the trial judge's acknowledgment that petitioner "received a fair trial, and had competent representation." ROA.5722; *see also* ROA.1377 (same judge denying petitioner's new-trial motion). The trial judge merely explained that the state-habeas experts strengthened *his existing* doubt that petitioner was guilty. ROA.5722-23. But petitioner's jury harbored no such doubt. It convicted her.

Even if evidence-weighing disputes were cognizable, they face an extremely high bar under AEDPA. Deference to the CCA "should have been near its apex in this case, which involves a *Strickland* claim" under "general, fact-driven standards." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) (per curiam); *accord Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009). The "more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). AEDPA "prevent[s] federal habeas 'retrials'" and "ensure[s] that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). It does not authorize critiquing state-court decisions for error correction. *See Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019) (en banc), *cert. denied*, No. 19-6413 (U.S. Apr. 20, 2020). The magistrate judge's "essentially de novo analysis disregarded this deferential standard." *Sexton*, 138 S. Ct. at 2560-61.

The habeas grant rests on one judge's view of debatable facts in a routine *Strickland* prejudice analysis. There is no reason to think the magistrate judge rendered a "more competent" analysis than the CCA. *Titlow*, 571 U.S. at 19. His disagreement

does not show that the CCA decided an issue unreasonably or let federal courts "use a set of debatable inferences to set aside the conclusion reached by the state court." *Rice v. Collins*, 546 U.S. 333, 342 (2006).

## II. The District Court Erred in Granting Relief Under *Strickland*.

Petitioner is not entitled to relief under *Strickland*. Federal-habeas relief was barred unless the CCA's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). As noted above, every step of the habeas grant requires overcoming AEDPA's relitigation bar to find the CCA's *Strickland* analysis unreasonable.

The magistrate judge found the CCA's *Strickland* analysis unreasonable because petitioner had a constitutional right to the funding she now seeks under *Ake*, so foregoing that claim prejudiced petitioner. ROA.893-97, 900, 903. Granting relief on that basis violated AEDPA's relitigation bar. But even under de novo review, the ineffective-assistance claim fails.

### A. The magistrate judge identified no clearly established Supreme Court rule that the CCA could have violated.

The magistrate judge failed in his "first task": deciding what constitutes the clearly established law the CCA supposedly misconstrued. *Grim v. Fisher*, 816 F.3d 296, 304 (5th Cir. 2016). AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final." *Id.* The magistrate judge discussed four Supreme Court cases in

finding the CCA's *Strickland* application unreasonable. ROA.897-903. None of them clearly establish any rule violated by the CCA, so AEDPA bars relief. *See Pierre v. Vannoy*, 891 F.3d 224, 228 (5th Cir. 2018).

### 1.  *Hinton v. Alabama* was decided after the 2012 CCA ruling.

Federal courts consider only Supreme Court holdings extant at the time the state court ruled. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, the CCA could not have unreasonably applied *Hinton*, which was decided after the CCA denied relief. ROA.894-903. Even if *Hinton* arguably "rejects" the CCA's reasoning (it does not), ROA.902, it was not "a part of 'clearly established' Supreme Court law at the time of the [CCA]'s decision," *Proctor v. Cockrell*, 283 F.3d 726, 735 (5th Cir. 2002).

Regardless, *Hinton* cannot justify relief. Reasonable jurists could find it "does not cover" this case. *Langley*, 926 F.3d at 160. *Hinton* never cites *Ake*, let alone any scenarios in which the Constitution mandates taxpayer-funded forensic experts. Hinton's attorney unreasonably failed to ask for "additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he" was not entitled to additional funding under state law. *See* 571 U.S. at 274. Unlike *Hinton*, "there is no evidence in this record to suggest trial counsel's decision was based on an incorrect view of the law that could have been remedied by examining the applicability of a statute." *United States v. Causey*, 568 F. App'x 269, 275 (5th Cir. 2014) (per curiam). Nor did counsel want to replace his expert. *See* ROA.3938.

### 2.  *McWilliams v. Dunn* was also decided after the CCA ruled.

No court could find clearly established law in *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017), which came down years after the CCA's ruling. *Contra* ROA.897-98.

Also, *McWilliams* "does not cover" this case. *Langley*, 926 F.3d at 160. *McWilliams* involved a state-funded psychiatrist who examined the defendant without otherwise aiding the defense. 137 S. Ct. at 1800-01 (expert never "helped the defense prepare direct or cross-examination of any witnesses, or testified at the judicial sentencing hearing"). By contrast, petitioner's state-funded expert assisted defense preparation for nearly a year and testified. *Jimenez*, 364 S.W.3d at 884-85.

### 3. *Ake v. Oklahoma* establishes no rule about forensic experts.

Nor could the CCA have misapplied *Ake*. ROA.897-903. At the time petitioner's conviction became final, the Supreme Court had not extended *Ake* beyond funding for psychiatric assistance or described factors entitling defendants to forensic-experts. Accordingly, "the state trial court was not bound as a matter of federal constitutional law to apply *Ake*" to petitioner's experts. *Gary v. Hall*, 558 F.3d 1229, 1254 (11th Cir. 2009); *see also Verrett v. Vannoy*, No. CV19-0351, 2019 WL 3805178, at *10 (E.D. La. July 29), *report & rec. adopted*, 2019 WL 3802454 (Aug. 13, 2019) (state court could not unreasonably apply *Ake*, which did not state "what circumstances, if any, would entitle an indigent defendant to non-psychiatric expert assistance.").

AEDPA bars federal courts from "extend[ing]" *Ake* here. *Langley*, 926 F.3d at 159-60. *Ake* did not require the State to provide "an effective defense," or taxpayer-funded specialists at trial to "present an adequate defense," as the magistrate judge said. ROA.898, 909. The Supreme Court "has never interpreted *Ake* to guarantee a due process right to effective expert assistance at trial." *Carter v. Davis*, 946 F.3d 489, 521 (9th Cir. 2019) (per curiam); *accord Joseph v. Angelone*, 184 F.3d 320, 327

(4th Cir. 1999). It is "reasonable to conclude that the dictates of *Ake* were met" with the funds provided here. *Campbell v. Polk*, 447 F.3d 270, 286 (4th Cir. 2006).

### 4. *Strickland* does not clearly establish the rule petitioner seeks.

*Strickland* establishes no rule about counsel's failure to seek additional expert funding given the uncertainty (at best) about his client's right to such funds. Counsel is not unreasonable for foregoing a claim that "would have failed." *Sexton*, 138 S. Ct. at 2559. The CCA stated petitioner was not entitled to "additional experts, beyond Dr. Kanfer." *Jimenez*, 364 S.W.3d at 888. This was "an authoritative statement from the state's highest criminal court that [petitioner's] proposed objection would have been meritless." *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007). This Court has also explained that "no federal law" mandates "an additional expert" under *Ake*. *See Harris v. Thaler*, 464 F. App'x 301, 308 (5th Cir. 2012) (per curiam). Counsel is never required to seek relief where it "would have been futile in light of existing state law and the right was not clearly established under federal law." *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir. 1998). So petitioner cannot rely "on *Ake* to show that counsel was ineffective for failing to request" more funding. *See Modden v. Johnson*, 252 F.3d 436, at *5 (5th Cir. 2001) (unpublished).

### B. The CCA's decision was not contrary to or an unreasonable application of clearly established federal law under section 2254(d)(1).

In addition, section 2254(d)(1) permits relitigation of claims only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Richter*, 562 U.S. at 102. A petitioner "meets this demanding standard only when he shows that the state court's decision was 'so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (per curiam) (citation omitted). A "habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.

**1.** The CCA's decision was not contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" by the Supreme Court, or if the state court's decision differs from a Supreme Court decision addressing "materially indistinguishable" facts. *Williams*, 529 U.S. at 405-06. If no Supreme Court case confronts "the specific question presented," the state court's decision cannot be "contrary to" any holding of the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). Petitioner identifies no Supreme Court holding articulating her expert-funding rule or applying it to decide "whether and to what extent" the Constitution requires the State to provide, or counsel to seek, the funding at issue. *Cf. Langley*, 926 F.3d at 158.

Petitioner argues that trial counsel's duty under *Strickland* imposes an obligation to seek funding beyond that which is required by *Ake*. ROA.550-51 (citing *Hinton*, 571 U.S. at 274-75). But the Supreme Court did not establish that rule in *Hinton*. *See supra* Part II.A. If the "circumstances of a case are only 'similar to'" precedent, "then the state court's decision is not 'contrary to' the holdings in those cases."

*Woods*, 575 U.S. at 317. The same is true of the magistrate judge's reliance on *McWilliams* and *Ake*. *See* ROA.893-903.[2]

**2.** Nor was the CCA's decision an "unreasonable application" under section 2254(d)(1). An unreasonable application occurs "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. A decision is unreasonable "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 419, 427 (2014) (quoting *Richter*, 562 U.S. at 103).

Extending *Ake* to petitioner's experts is error under AEDPA, *Langley*, 926 F.3d at 159-60, and no basis to fault the CCA, *Woodall*, 572 U.S. at 426. Petitioner cited "no case from any jurisdiction" adopting her expansive view of *Ake. Jimenez*, 364 S.W.3d at 888. And the "facts here are not similar to cases" applying *Strickland. Adekeye v. Davis*, 938 F.3d 678, 684 (5th Cir. 2019). Tellingly, petitioner identifies no examples of defense lawyers who were found ineffective for failing to seek the funding she says her lawyer should have. It is well-established that counsel need not

---

[2] Insofar as alleged errors did not create a "high risk of an inaccurate verdict," *Jimenez*, 364 S.W.3d at 888, that tracks *Strickland*, which tests whether a trial court "would have reversibly erred by refusing" a motion. *Amos v. Thornton*, 646 F.3d 199, 209-10 (5th Cir. 2011) (per curiam) (citation omitted). Had counsel made a funding motion that was denied, a Texas appellate court would have examined whether denial created a "high risk of an inaccurate verdict." *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App.) (per curiam).

seek relief he is unlikely to obtain. *See Sexton*, 138 S. Ct. at 2559; *Turner*, 481 F.3d at 298. The state of then-existing law thus informs which claims are "worth pursuing." *Smith v. Murray*, 477 U.S. 527, 536 (1986). As noted above, a claim for additional funding would have been fruitless. *Jimenez*, 364 S.W.3d at 887-88.

Supposedly, counsel unreasonably failed to follow Texas rules for seeking forensic-expert funding, ROA.784-85 & n.9, 897-900, 903-09. According to the magistrate judge, "settled *Texas law* was that *Ake* required that expert funding be provided to indigent defendants," and set out requirements for formalizing a record of such requests. ROA.894 (citing *Rey*, 897 S.W.2d at 337-38) (emphasis added). Texas cases provide that a defendant might obtain "another or a different expert" under certain circumstances. *See Jimenez*, 364 S.W.3d at 877 & n.31 (citing *Busby*, 990 S.W.2d at 271). But because the "rule was announced by a Texas court, not the Supreme Court," it "does not constitute clearly established federal law" such that noncompliance "renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Smith*, 927 F.3d at 332.

The magistrate judge also found that the CCA unreasonably concluded that petitioner did not demonstrate a "'high risk of an inaccurate verdict'" from trial counsel's failure to seek funding for or retain more court-appointed experts. ROA.898-99 (quoting *Jimenez*, 364 S.W.3d at 888). But in reaching that conclusion, the CCA was applying Texas precedent. *Jimenez*, 364 S.W.3d at 876 & n.24, 888 & n.72 (quoting *Busby*, 990 S.W.2d at 271). That the CCA refused to extend *Ake* is a matter of state law, not grounds for federal-habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 68-71

(1991); *Langley*, 926 F.3d at 159-60; *Garcia v. Stephens*, 793 F.3d 513, 520 (5th Cir. 2015).

These facts alone are dispositive. But the magistrate judge also erred in faulting the CCA's *Strickland* analysis.

**a.** Regarding deficiency, the magistrate judge mistakenly believed that the CCA found trial counsel's performance deficient. ROA.885, 893. It did not. The CCA explained that counsel was "not ineffective" because petitioner was not entitled to the funding at issue. *Jimenez*, 364 S.W.3d at 887-88. That trial counsel "did not utilize the proper procedure," ROA.895, for seeking unavailable funding is immaterial, *see Richter*, 562 U.S. at 105 (*Strickland* is not a "best practices" standard). While the CCA noted that petitioner "forfeited consideration of her *Ake* claim on habeas review because she failed to preserve her constitutional claim in the trial court," *Jimenez*, 364 S.W.3d at 882), finding a claim forfeited is not stating that it had merit.

**b.** The magistrate judge erroneously analyzed prejudice (ROA.897-900) because no Supreme Court rule required the CCA to find an *Ake* claim worth preserving.

**i.** The magistrate judge misunderstood the question before the CCA. The action challenged under *Strickland* was an alleged *pretrial* failure in seeking expert funding. The magistrate judge believed the state-habeas experts would have performed better than Dr. Kanfer did *at trial*. ROA.891-92. Petitioner concedes that the jury "might still have credited his testimony" but for his performance on the stand. ROA.4143, 4177. The CCA found that any issues with Dr. Kanfer's performance were unforeseeable, *Jimenez*, 364 S.W.3d at 884-86, so that cannot justify relief. Nor has petitioner shown that trial counsel could have retained the state-habeas experts.

**ii.** The State did not deny petitioner "the right to an independent defense expert . . . to help the defense evaluate the opposing experts' opinions and translate the data into a sound and convincing legal strategy, and help the defense prepare to effectively cross-examine the prosecution's witnesses." ROA.897. The CCA explained in undisturbed findings that the State provided such a witness in Dr. Kanfer, an experienced forensic pathologist. *Jimenez*, 364 S.W.3d at 884-85. Notwithstanding the magistrate judge's view of Dr. Kanfer's ultimate impact at trial, the CCA, as the "ultimate fact finder," was entitled to find otherwise. *Jimenez*, 364 S.W.3d at 870.

For example, no rule required the CCA to discount Dr. Kanfer's qualifications. *Id.* at 888. Dr. Kanfer testified he identified suspected child-abuse cases for state authorities many times and had testified in multiple cases that a child was abused, and he rejected the prosecutor's suggestion that he was not qualified to testify in child-abuse cases. ROA.2626-31. He hardly "admitted" a lack of qualification "to testify as to pediatric choking incidents or child abuse." ROA.888 & n.16. The magistrate judge dismissed Dr. Kanfer's description of his own experience as "incredulous[]." ROA.888 n.16. But no rule required the CCA to share that view. Regardless, the relevant question under *Strickland* was whether trial counsel believed his expert had pediatric experience, and counsel's representations to the trial court and prosecutors indicated he did. *Jimenez*, 364 S.W.3d at 888.[3]

---

[3] The magistrate judge attacks the reasonableness of counsel's understanding with evidence that was not adduced in state habeas. ROA.888 & n.17 (citing ROA.793); *see* ROA.805-07. *Pinholster* bars such evidence. 563 U.S. at 180. Nor

**iii.** No clearly established law required the CCA to find the forensic-expert testimony dispositive. The CCA acknowledged that additional experts might have been helpful. *Id.* But the jury heard defense counsel probe the weaknesses in the State's case and was unpersuaded. *See, e.g.*, ROA.3938-40, 2908-40. Where additional experts merely "address[] the same problems with the testimonies of the Government's witnesses," those experts are unnecessary to avoid a "clear negative impact on the outcome of the trial." *Causey*, 568 F. App'x at 276. The CCA was not required to find that the same evidence re-presented through different witnesses would likely be persuasive. *See Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004).

Also, "direct evidence" was central to the case in a way that cannot be resolved by experts alone. ROA.886. The state-habeas opinions were influenced by evidence such as the presence or absence of injuries to petitioner and B.G. ROA.890-91, 4197-98, 4242-43, 4258, 4798-99, 4904-05; *see also* ROA.2533, 2554 (Dr. Kanfer). It was thus not enough to give examples of different, nonfatal choking incidents, ROA.899, or explain that it was "physically possible" to choke on the wad. ROA.886.

Nor could the experts explain away the State's other evidence, such as petitioner's incriminating statements, ROA.3664-65, evidence suggesting that she sanitized the crime scene, ROA.2206-12, 2447-48, and inconsistencies in her accounts about finding B.G. *Compare* ROA.1976-78, *with* ROA.2271. Regardless of whether incriminating behavior alone is an "indication[] of abuse," ROA.899,

---

could the court consider "arguments against the state court's decision that [petitioner] never even made in [her] state habeas petition." *Sexton*, 138 S. Ct. at 2560.

"contradictory stories told by a defendant can demonstrate a consciousness of guilt" that corroborates the State's case. *United States v. Smith*, 135 F.3d 963, 972 (5th Cir. 1998). On this record, it was hardly a "minor" detail "whether B.G. was standing or on the ground when Jimenez discovered him choking." ROA.886, 899. One version of petitioner's story was significantly more helpful to her theory that B.G. was still breathing when she sought help; the other supports the State's theory that B.G. went longer without air before she did. As petitioner's state-habeas expert acknowledges, details that "lessen the person's responsibility" are relevant. ROA.4259.

**iv.** The CCA did not allow the State's case to go "unchallenged" under clearly established federal law. ROA.898. With one exception (Dr. Alexander), the State's medical witnesses were the physicians who treated or examined B.G. No one disputed the qualifications or reliability of these witnesses at trial, and the factfinder decides what weight to give their testimony. *See Fox*, 200 F.3d at 1297. According to the magistrate judge, petitioner should have received multiple specialists to "respond" to the State's witnesses with competing testimony and examples of "cases of non-fatal pediatric choking." ROA.899. But *Strickland* "does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 562 U.S. at 111.

Here, trial counsel consulted with experts for nearly a year to understand the weaknesses of the State's case, ROA.3937, extracted concessions from the State's witnesses, *e.g.*, ROA.2477-78, 2686, 2735, 2772-73, and appealed to jury's common sense after highlighting flaws in the State's case, ROA.2909-38. The CCA's decision

reflects that trial counsel subjected the State's case to adversarial testing, which was all the Constitution required. *See United States v. Cronic*, 466 U.S. 648, 656 (1984).

## C. Relief was not warranted under section 2254(d)(2).

The magistrate judge also found the conclusion that counsel's failure to preserve an *Ake* claim was not ineffective factually unreasonable under section 2254(d)(2). *Jimenez*, 364 S.W.3d at 888; *see* ROA.885, 892-93. But the CCA's ruling was not "based on" finding that petitioner's state-habeas experts would not have changed the trial outcome. 28 U.S.C. § 2254(d)(2). Petitioner was not constitutionally entitled to, and counsel was not required to seek, funding for experts beyond Dr. Kanfer. *Jimenez*, 364 S.W.3d at 887-88. That explanation for the CCA's decision stands apart from any effect different experts might have had at trial. Moreover, relief is inappropriate under section 2254(d)(2).

**1.** Petitioner cannot overcome AEDPA's exceptional deference to state-court factfinding. Section 2254(e)(1), which provides that state-court findings of fact are "presumed to be correct," requires "clear and convincing evidence" to rebut the presumption. Petitioner has not demonstrated, by clear and convincing evidence, that any CCA findings are incorrect. Without that proof, she cannot show that any findings were unreasonable. *See Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (noting that "[section] 2254(e)(1) supplements § 2254(d)(2)" and the clear-and-convincing evidence standard "is 'arguably more deferential' to the state court than is the unreasonable-determination standard").

The magistrate judge believed the CCA could not have reasonably reached the result it did. ROA.892. But a factual determination about counsel's representation

under section 2254(d)(2) is a "different question" from whether "the application of *Strickland* was reasonable under § 2254(d)(1)." *Wood v. Allen*, 558 U.S. 290, 304 (2010). The magistrate judge merely disagreed with the CCA about the legal significance of facts in the record. ROA.891-92. AEDPA forecloses such disagreement as a basis for habeas relief, which is not "based on" any finding about trial counsel's representation. *See, e.g.*, *O'Quinn v. Spiller*, 806 F.3d 974, 978 (7th Cir. 2015); *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011).

AEDPA likewise forecloses the magistrate judge's accusation that the CCA "never mentions" Dr. Brian Dunham, a colleague of two of petitioner's state-habeas experts referenced in their opinions, who treated a nonfatal choking case with markedly different facts. ROA.889; *see* ROA.4401-03. Petitioner never even argued to the CCA that trial counsel should have sought to retain Dr. Dunham. *See* ROA.4134-89. Her failure to make an adequate record is a legal matter of state-habeas procedure, not a complaint about CCA findings. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2277 n.3 (2015). Moreover, since the argument was not raised in state court, it could not have merited federal-habeas relief. *See Sexton*, 138 S. Ct. at 2560.

**2.** What petitioner attacks as unreasonable are not findings under Section 2254(d)(2). *Strickland*'s prongs are mixed questions of law and fact assessed for reasonableness under section 2254(d)(1). *Martin v. Cain*, 246 F.3d 471, 475-76 (5th Cir. 2001); *accord Clark v. Waller*, 490 F.3d 551, 556 & n.2 (6th Cir. 2007)). Section 2254(d)(2) applies only to "basic, primary, or historical facts," not to "[i]nferences, characterizations of the facts, and mixed fact/law conclusions." *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir. 2002).

According to the magistrate judge, a *Strickland* prejudice conclusion that "the absence of testimony from [petitioner's] experts … did not create a 'high risk of an inaccurate verdict'" was "an unreasonable determination of the facts." ROA.898 (quoting *Jimenez*, 364 S.W.3d at 888). But that falls outside section 2254(d)(2) because the court "was not making factual findings; it was making a legal conclusion about prejudice." *LaHood v. Davis*, 653 F. App'x 253, 262 (5th Cir. 2016).

**3.** Even if section 2254(d)(2) applied, the magistrate judge exceeded its scope. Rather than assuming the reasonableness of the CCA's findings "in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), the magistrate judge imagined his own record. For instance, virtually every critique of the CCA's *Strickland* analysis relies on a supposed fourth expert (Dr. Dunham), even though petitioner did not in her state-habeas application. *See* ROA.874, 887-89, 898-900; *see also Sexton*, 138 S. Ct. at 2560 (forbidding this). The magistrate judge also thought it unreasonable to conclude the verdict "would not have been different if the jury had heard the testimony of the habeas experts *rather than* Dr. Kanfer." ROA.892. (emphasis added). AEDPA forbade this, as the jury did hear from Dr. Kanfer, whom the CCA held was reasonably utilized by trial counsel. *Jimenez*, 364 S.W.3d at 884-85. Counsel's strategic decision to present Dr. Kanfer was "virtually unchallengeable." *Strickland*, 466 U.S. at 690. The magistrate judge left the CCA's ruling on that basis untouched. AEDPA required him to assume the CCA correctly understood the strengths and weaknesses of petitioner's state-habeas experts while accounting for Dr. Kanfer's performance as it occurred.

But even if the CCA made some unreasonable determination of fact, the record "in the State court proceeding" still does not demonstrate prejudice. 28 U.S.C. § 2254(d)(2). The magistrate judge believed trial counsel made several unsuccessful funding requests, ROA.895, yet he demanded no proof of what the experts in those motions would have said at trial. Instead, he found constitutional violations based on the state-habeas experts, whom it is unclear trial counsel even knew existed or could have retained.

**4.** Finally, if any challenged conclusions are factual findings, they are reasonable. The magistrate judge merely highlights the most favorable parts of the state-habeas record and emphasizes the least favorable aspects of Dr. Kanfer's performance. *See* ROA.885-93, 897-903. Under AEDPA, weighing the persuasiveness and credibility of experts leaves considerable room for judgment. A federal court cannot declare "state-court factual determinations . . . unreasonable merely because [it] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (quoting *Wood*, 558 U.S. at 301). The CCA's rulings were not "beyond the pale of fairminded dispute." *Thomas v. Vannoy*, 898 F.3d 561, 574 (5th Cir. 2018).

**a.** The CCA's statement that the state-habeas experts "reached exactly the same ultimate opinion as Dr. Kanfer and for almost precisely the same reasons," ROA.887 (alteration omitted) (quoting *Jimenez*, 364 S.W.3d at 888), is not unreasonable. The magistrate judge thought the state-habeas experts were more persuasive than Dr. Kanfer. ROA.887, 890, 891-92. But whatever their persuasiveness, the habeas experts merely re-urged medical interpretations of the physical evidence and testimony presented or available at trial. ROA.4478.

While the material differences were supposedly "too many to list," ROA.890, the magistrate judge actually describes similarities with Dr. Kanfer's opinion—namely that if the choking had been intentional, there should have been more injuries to B.G. ROA.890-91; *see* ROA.2533, 2554, 4904-09. Dr. Kanfer also theorized that efforts to resuscitate B.G. forced the wad deeper into the boy's throat, fully blocking his airway. ROA.2598-63. The state-habeas opinions also incorporated this theory. *See* ROA.4198 (Dr. Zur); ROA.4202-04 (Dr. McCloskey).

The state-habeas experts also share Dr. Kanfer's difficulty in explaining how a 21-month-old child *produced* the wad from five intact paper towels *and* pushed it down his own throat. The state-habeas experts had more narrow theories about whether it was scientifically "possible" for B.G. to choke on large objects based on "superior experience and qualifications." ROA.886, 889. But, like Dr. Kanfer, they were left to speculate about how B.G. got the wad into his mouth without contradicting other evidence, like the absence of teeth marks on the towels and petitioner's description of events. *E.g.*, ROA.4881-90. Supposedly, the state-habeas experts could have offered "examples of similar accidental choking events" involving toys or food, ROA.508, but none of those examples matched B.G.'s choking.

**b.** Nor was it factually unreasonable to find petitioner's defense "cogently, coherently, and completely" presented. ROA.891 (quoting *Jimenez*, 364 S.W.3d at 888). The magistrate judge dismissed this statement because the State had more witnesses and the magistrate judge disliked Dr. Kanfer's presentation. ROA.891-92. But the magistrate judge's assessment of the record was not the only permissible one.

Nor was the CCA required to accept the magistrate judge's one-sided characterization of Dr. Kanfer. Nothing mandated an interpretation that he supposedly "admitted his lack of credentials and lack of preparation," ROA.892, especially given Dr. Kanfer's own description of his pediatric and child-abuse experience. *See supra* p.30. Moreover, petitioner never challenged the reliability of Dr. Kanfer's opinion, and concedes that her complaints with his testimony are unrelated to the science. *See Jimenez*, 364 S.W.3d at 884-85; ROA.4177. So there is no reason why the CCA (which had already found Dr. Kanfer qualified), needed to re-state the obvious: his opinions "were based on 'scientific methodology' and 'were supported by scientific data.'" ROA.890 (quoting *Jimenez*, 364 S.W. 3d at 874).

According to the magistrate judge, the CCA should have discounted Dr. Kanfer because he performed an "experiment" in forming his opinion. ROA.889-90. But so did Dr. Zur, petitioner's state-habeas expert and a top pediatric-airway specialist. ROA.4525. The magistrate judge never mentions this fact. Dr. Kanfer worked with the defense team for nearly a year to re-create a plausible version of B.G.'s choking that fit the evidence. *Jimenez*, 364 S.W.3d at 884. He even worked with counsel and another defense specialist to create the simulation played for the jury. ROA.3935. The experiment was not "impromptu." ROA.890. It simulated B.G. forming the wad after dropping the towels into a sink or toilet, like B.G.'s mother testified he had once done with a roll of toilet paper. ROA.2789, 2811.

Moreover, the state-habeas opinions were purportedly "based on their full review of the record evidence and their consultations with other specialists," whereas Dr. Kanfer's was not. ROA.889. Dr. Kanfer's testimony suggests that his review

included far more than what the magistrate judge stated. *Compare* ROA.889 n.19, *with* ROA.2521, 2531, 2534-36, 2590, 2605-06, 2612-16. Most notably, Dr. Kanfer watched the video of the wad being unraveled that was played for the jury. *See* ROA.2441-45, 2605. The state-habeas experts did not. ROA.4192-93, 4200-01, 4207-08, 4881. Predictably, their speculation about how B.G. formed the wad did not match what the jury saw. *E.g.*, ROA.4890, 4895 (Dr. McCloskey speculating that B.G. chewed the towels one at a time). The magistrate judge does not mention this, let alone explain how it constitutes a "full review of the record evidence." ROA.889. Nor does he explain how Dr. Kanfer's *own testimony* that he "consulted with 'colleagues'" could be "[un]supported by the record." ROA.890. In sum, the magistrate judge's view of this record was hardly beyond debate.

### D.  Petitioner cannot prevail even if AEDPA does not bar relitigation.

To secure relief, petitioner must do more than overcome AEDPA's relitigation bar. *E.g., Langley*, 926 F.3d at 156. She must show that she is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner cannot do so because counsel's performance did not violate the Constitution. The only constitutional deficiency identified below was counsel's failure properly to present requests for additional funding.[4] *Strickland* requires a showing of

---

[4] Petitioner cannot argue that counsel's performance violated *Strickland* cumulatively. "[M]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008). Likewise, petitioner cannot cumulate errors to show a due process violation. *See Turner*, 481 F.3d at 301; *Zimmerman v. Cockrell*, 69 F. App'x 658, at *8 (5th Cir. 2003) (per curiam). Relief on that basis would also violate *Teague*'s "new

"both deficient performance by counsel and prejudice." *Mirzayance*, 556 U.S. at 122. Petitioner can show neither.

**1.** Petitioner's trial counsel was not deficient. The question is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Although, "in hindsight, it is easy to say that trial counsel could have done more," *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008), that is not the test. Trial counsel sought and received State funding for a competent, experienced forensic expert, whose ultimate difficulties on the stand were unforeseeable. *Jimenez*, 364 S.W.2d at 887-88. Counsel had no obligation to assemble a "'team of experts' paid for by the taxpayers." *Id.* And because no law supported an *Ake* claim, he was not unreasonable in foregoing it. *See Sexton*, 138 S. Ct. at 2559; *Turner*, 481 F.3d at 298.

Viewed as a whole, counsel's performance was well "within the wide range of reasonable professional assistance" guaranteed by the Sixth Amendment. *Bell*, 535 U.S. at 702. Dr. Kanfer came highly recommended, and trial counsel hired him after another forensic pathologist, Dr. Norton, indicated she would not take an appointed case. ROA.3935, 4227. Additionally, counsel hired a graphics-simulation expert, consulted with two other physicians to assist trial preparation, and retained "an experienced psychologist," although counsel ultimately decided not to call him. ROA.3935. Petitioner cannot overcome the "'strong presumption' that counsel's

---

rule" prohibition and be procedurally barred because petitioner never raised a cumulative-error claim in state court. *See Nickleson v. Stephens*, 803 F.3d 748, 753-54 (5th Cir. 2015).

representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). It is virtually impossible to "establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," *id.* at 111, which the CCA found here, *Jimenez*, 364 S.W.3d at 884-87.

Also, to preserve an *Ake* claim where he had already gotten approval for one forensic expert, counsel would have had to identify another expert and describe the noncumulative assistance he would have provided. *See id.* at 877-78. It is doubtful that a reasonable lawyer could have made this showing when petitioner says trial counsel should have, given that issues in Dr. Kanfer's trial performance were unforeseeable. Courts may only "'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time.'" *See Richter*, 562 U.S. at 789 (citation omitted).

Whether petitioner might have received a "better expert" (ROA.903) is immaterial. *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007). Contrary to petitioner's argument, deficiency cannot be based on after-the-fact presentation of experts who might have been "more experienced and qualified." ROA.555 (citing *Hinton*, 571 U.S. at 275-76). It is not enough that "habeas counsel located another expert" who reached "more sympathetic" conclusions. *Nelson v. Davis*, 952 F.3d 651, 664 (5th Cir. 2020); *accord Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011). Even if other witnesses "might have been available," that is not proof of incompetence. *Grossman v. McDonough*, 466 F.3d 1325, 1347 (11th Cir. 2006).

Counsel may have "liked to have" additional experts, but he also recognized constraints in "the willingness of people contacted to take appointed cases." ROA.4226. Unsurprisingly, when habeas counsel found private parties to pay for additional experts, trial counsel found them helpful. ROA.4226. But *Ake* concerns only the "basic tools" of a defense, not funding for all the experts a private party might buy, 470 U.S. at 77, or a bespoke team of specialists, *see Page v. Lee*, 337 F.3d 411, 417 (4th Cir. 2003) ("*Ake* speaks only of the aid of a 'competent psychiatrist,' not a 'forensic' psychiatrist.").

**2.** Nor can petitioner show prejudice: "but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 391. The question is not "whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. *Strickland* "asks whether it is 'reasonably likely' the result would have been different," and the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 111-12 (citation omitted). That requirement is not met, given that petitioner merely re-presents the same, unpersuasive defense through different witnesses.

Petitioner has not made a record sufficient to demonstrate prejudice from counsel's supposed failure to formalize funding requests. "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). Without knowing what those witnesses would have said, it is impossible to conclude that failing to formalize requests to hire them was ineffective. *See id.*; *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about

what an expert could have said is not enough to establish prejudice."). Moreover, petitioner did not even make a full record of how her state-habeas experts would have performed, given that Dr. Ophoven was never cross-examined.

It is also speculative that stacking experts would have changed the result. Even the best experts petitioner could muster cannot agree about how this incident happened in a way that matches all the evidence. They cannot conclusively rule out intentional injury. The supposedly "better expert[s]," ROA.903, still speculate about how B.G. formed the massive wad of paper towels, hypothesizing that five paper towels were too difficult for petitioner to have stuffed in B.G.'s mouth but easy enough for a 21-month-old to do on his own. They were equivocal about how much force it would have taken and what injuries would show that B.G. had been restrained. *Compare, e.g.*, ROA.4800, *with* ROA.4607-08, *and* ROA.4258; *compare also* ROA.4798-99, and ROA.4258, *with* ROA.4627-29. One expert suggested that B.G. might have ingested the paper towels gradually or somehow got them wet enough to compress. *See* ROA.4895. Another similarly speculated that it could have happened "different ways." ROA.4597. This proves too much. It suggests that it does not matter how B.G. managed to form a choking hazard out of five intact paper towels, but that is hardly consistent with trial counsel's strategy or the defense argued to the jury. *See* ROA.2908-40, 3939-40.

Weaknesses like these would not have been lost on the jury. A "prolonged attack, without a clear-cut resolution," can make even "a minor, but highly inflammatory, issue a much more prominent feature in the jury's deliberation." *United States v. Bourgeois*, 537 F. App'x 604, 629 (5th Cir. 2013) (per curiam). The overall

evidence showing that B.G. was murdered "simply makes more sense than the testimony of the other experts." *Barrett v. Acevedo*, 169 F.3d 1155, 1165 (8th Cir. 1999).

## III. Petitioner Is Not Entitled to Relief on Her *Ake* Claim.

Petitioner is not entitled to relief on her *Ake* claim. It is procedurally defaulted, meritless, and *Teague*-barred.

### A.  Petitioner's *Ake* claim is procedurally defaulted and meritless.

Petitioner's freestanding *Ake* claim is procedurally defaulted. ROA.904 (citing *Walker v. Martin*, 562 U.S. 307, 315 (2011)). The CCA rejected the claim under "the Texas contemporaneous objection rule," which "constitutes an adequate and independent state ground for dismissal" of an unpreserved claim. ROA.904 (citing *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005)). The magistrate judge, however, explained that "[i]neffective assistance of counsel constitutes cause for a procedural default if that ineffective assistance claim was presented to the state courts as an independent claim." ROA.905 (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). He thus relied on the ineffective-assistance found in reviewing petitioner's *Strickland* claim to review the *Ake* claim de novo. ROA.905.

But that was error, and petitioner cannot overcome the default. Because petitioner cannot prevail on her *Strickland* claim, she cannot prevail on her defaulted *Ake* claim. ROA.905-09. If trial counsel did not make a sufficient record of a funding request under *Ake*, then the trial court can hardly be faulted for failing to sustain an objection that was never properly before it. As the CCA explained, "the reasonableness of a trial judge's denial of an *Ake* motion depends upon the specific information

that the trial judge had in front of him at the time that he denied that motion." *Jimenez*, 364 S.W.3d at 880 (citing *Conklin v. Schofield*, 366 F.3d 1191, 1208 (11th Cir. 2004); *Moore v. Kemp*, 809 F.2d 702, 710 (11th Cir. 1987)). The magistrate judge's approach improperly cumulates an error of counsel (*Strickland*) with an error by the trial court (*Ake*). *See Hood v. Dretke*, 93 F. App'x 665, 672 (5th Cir. 2004) (per curiam). The trial judge did not err.

The magistrate judge supported his reasoning with a proposed state-habeas-trial finding that "Jimenez had been denied the resources needed to hire experts other than Dr. Kanfer." ROA.907 (footnote omitted). But CCA is the "ultimate fact finder," *Jimenez*, 364 S.W.3d at 870, and this proposed finding did not survive review. The CCA found "nothing in the trial record that shows that the trial judge denied any *Ake* motions or other requests for monetary assistance to retain experts," "nothing in the trial record that reflects" a request for additional funds, and "nothing in either the trial or habeas record that shows when" this supposed request occurred. *Id.* at 880. Stated differently, petitioner was not denied anything.

Rather than scouring moribund state-habeas findings, AEDPA required the magistrate judge to consider only "the *last* reasoned state court decision," without regard to lower-court findings that were "explicitly or implicitly reject[ed]." *Isaac v. Cain*, 588 F. App'x 318, 325 (5th Cir. 2014) (quoting *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012)). Thus, it would not matter if the CCA "itself made no findings on the issue." ROA.907. What the CCA did is irreconcilable with the statement relied on by the magistrate judge. Thus, he should have concluded that the "factual finding underpinning Jimenez's *Ake* claim" was not viable. ROA.907.

According to the magistrate judge, "finding that the trial court denied Jimenez adequate funding to obtain expert witnesses is not inconsistent with the Court of Criminal Appeals' denial of relief based on [trial counsel]'s failure to preserve this claim." ROA.908-09 (citing *Murphy v. Davis*, 901 F.3d 578, 594-97 (5th Cir. 2018)). That is wrong for the reasons just explained. Assuming that is right, however, the *Ake* claim is still barred. If counsel made a funding request, albeit an unsuccessful one, then he was *not* ineffective and the procedural default would stand. The "test for ineffectiveness is not whether counsel could have done more; petitioner "was entitled to 'reasonable competence, not perfect advocacy.'" *King v. Davis*, 883 F.3d 577, 588 (5th Cir. 2018). Thus, petitioner could not overcome procedural default on that basis (essentially challenging the CCA's application of state-law preservation rules). A state-law violation cannot support federal-habeas relief, and petitioner does not argue that the CCA's procedural ruling was an inadequate state ground.

Petitioner cannot prove prejudice on her *Ake* claim. The actual-prejudice standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), applies under *Ake*. *White v. Johnson*, 153 F.3d 197, 203-04 (5th Cir. 1998). The magistrate judge did not even cite *Brecht*. Instead, he referenced his previous ineffective-assistance analysis. ROA.909. But a petitioner who "fail[s] to show that the Supreme Court's ruling in *Ake* entitled [her] to the assistance of" an expert cannot rely "on *Ake* to show that counsel was ineffective for failing to request" the expert. *See Modden*, 252 F.3d 436, at *5. If the trial court denied counsel's funding requests, then petitioner was required to show what the missing evidence would have been. *See White* 153 F.3d at 208. Because petitioner lacks a "specific, affirmative showing of what the missing evidence or

testimony would have been," a habeas court cannot find prejudice. *Modden*, 252 F.3d 436, at *5.

## B.  Relief is barred by *Teague v. Lane*.

Granting relief under *Ake* would also violate *Teague*, which holds that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310 (plurality op.). Even on de novo review, federal courts must "not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997); *accord Chaidez v. United States*, 568 U.S. 342, 347 (2013). *Teague* forecloses petitioner's request for relief, which depends on new rules. *Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam).

Petitioner asks the Court to hold, for the first time, that an indigent defendant has a due process right to, and counsel is required to seek, State funding for multiple forensic experts at trial. Given the uncertainty about the funding required by *Ake*, *Teague* bars relief. Because these rules were not "compelled by existing precedent" when petitioner's convictions became final, they are new. *Netherland*, 521 U.S. at 156. And a new rule cannot apply retroactively unless it "falls within one of two narrow exceptions" that petitioner does not argue. *Tyler v. Cain*, 533 U.S. 656, 665 (2001).

It is immaterial that "both the Texas courts and the Fifth Circuit have applied *Ake* outside the context of psychiatric experts," as the district court noted.

ROA.1038. Only the Supreme Court can create new law under *Teague*, and it has not created petitioner's rule. *See, e.g.*, *Weeks v. Angelone*, 176 F.3d 249, 265-66 (4th Cir. 1999) (denying *Ake* claim for nonpsychiatric expert per *Teague*), *aff'd*, 528 U.S. 225 (2000); *Jackson v. Ylst*, 921 F.2d 882, 885-86 (9th Cir. 1990) (same).

## IV. Petitioner Is Not Entitled to Costs.

The district court also erred in awarding costs. Civil-litigation rules contemplate cost awards for prevailing parties, Fed. R. Civ. P. 54(d)(1), but apply only "to the extent that they are not inconsistent with any statutory provisions or these rules." Rule 12 of the Rules Governing Section 2254 Cases; *see* Fed. R. Civ. P. 81(a)(4)(A)-(B). The district court had "no other power" but to order petitioner released. *Fay v. Noia*, 372 U.S. 391, 430-31 (1963), *overruled on other grounds*, *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). The statutory power to issue federal-habeas writs does not extend beyond the power to release one "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The limitation falls outside the general availability of other relief, like costs. *See* Fed. R. Civ. P. 54(d)(1); *id.* R. 81(a)(4). Federal-habeas statutes control over any conflicting rule of civil procedure. *See Gonzalez v. Crosby*, 545 U.S. 524, 529-32 (2005); 28 U.S.C. § 2254 R. 12; Fed. R. Civ. P. 81(a)(4).[5]

---

[5] Although petitioner has not filed a bill of costs, late filing may be permitted for "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B).

## Conclusion

The Court should reverse and render judgment for the State.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant
  Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Kyle D. Hawkins
Solicitor General

/s/ Ari Cuenin
Ari Cuenin
Assistant Solicitor General
ari.cuenin@oag.texas.gov

Counsel for Respondent-Appellant

49

## CERTIFICATE OF SERVICE

On May 7, 2020, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ari Cuenin
ARI CUENIN

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,980 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Ari Cuenin
ARI CUENIN